**IN THE SUPREME COURT OF MISSISSIPPI**
**NO. 1999-CA-00585-SCT**

*NOLLIE F. REYNOLDS AND LARRY REYNOLDS*

*v.*

*AMERADA HESS CORPORATION AND DENBURY MANAGEMENT, INC.*

| | |
|---|---|
| DATE OF JUDGMENT: | 02/22/1999 |
| TRIAL JUDGE: | HON. FRANKLIN C. McKENZIE, JR. |
| COURT FROM WHICH APPEALED: | WAYNE COUNTY CHANCERY COURT |
| ATTORNEYS FOR APPELLANTS: | JAY BOLING |
| | O. MARVIN OATES, JR. |
| | ROBERT A. PRITCHARD |
| | STANFORD YOUNG |
| ATTORNEYS FOR APPELLEES: | JAMES L. HALFORD |
| | VICTORIA W. THOMAS |
| | WILLIAM F. BLAIR |
| | JEFFERSON D. STEWART |
| NATURE OF THE CASE: | CIVIL - CONTRACT |
| DISPOSITION: | AFFIRMED - 09/28/2000 |
| MOTION FOR REHEARING FILED: | 10/26/2000; denied 3/15/2001 |
| MANDATE ISSUED: | 3/22/2001 |

**BEFORE PRATHER, C.J., MILLS AND COBB, JJ.**

**MILLS, JUSTICE, FOR THE COURT:**

¶1. This case arises from a controversy involving a surface lease agreement entered into between Buel O. Reynolds and Trans-State Oil Company, now Amerada Hess Corporation (Hess). Chancellor Frank C. McKenzie, Jr. granted the summary judgment motions of Hess and its successor, Denbury Management, Inc., and entered a final judgment and permanent injunction enjoining Nollie F. and Larry Reynolds, Buel's successors in title, from interfering with the operation of the equipment and facilities at issue and dismissing the Reynoldses' counterclaims. We affirm.

## FACTS AND PROCEEDINGS BELOW

¶2. The facts in this case are undisputed. In 1940 the mineral owner of a large tract of land known as the Eucutta Field in Wayne County executed an oil and gas lease with Humble Oil Company, later known as Exxon. The lease granted Humble the following:

> the right of operating for and producing therefrom oil, gas and/or other minerals, casinghead gas and

casinghead gasoline, with right of way and easements for pipelines, telegraph and telephone lines, tanks, power houses, stations, gasoline plants and fixtures for producing, treating and caring for such products and any and all rights and privileges necessary, incident to or convenient for the economical operations of said land for oil, gas and/or other minerals, casinghead gas and casinghead gasoline.

This lease has been maintained by production of oil and gas to the present date.

¶3. On April 6, 1965, Buel Reynolds acquired title to the surface of approximately 300 acres in the heart of the Eucutta Field. This case concerns a 2.676 acre tract of this land. Reynolds acquired only the surface estate in the tract subject to the interest and rights of the mineral owners and the 1940 lease from the mineral owners to Humble.

¶4. In April, 1966, the Mississippi State Oil and Gas Board approved the East Eucutta Fieldwide Unit, naming Trans-State Oil Company (subsequently named Amerada Hess Corporation) the operator of the unit, under a Unitization Agreement and Unit Operating Agreement, to conduct secondary and pressure maintenance operations in the Eutaw Pool of the Eucutta Field. All mineral owners of the 2.676 acre tract ratified both the Unitization Agreement and Unit Operating Agreement (together the Fieldwide Unit Agreements). Additionally, Humble ratified the Fieldwide Unit Agreements, thus agreeing to the designation of Trans-State as operator of the Fieldwide Unit. The trial court found that as operator under the agreements Trans-State had authority from Humble to use the surface in the lands leased by Humble for the economical development, operation, and production of the fieldwide unit under the same rights and powers described above which Humble had received under the 1940 lease.

¶5. The 1940 lease appears to have authorized extensive use of the land in conducting oil and gas operations. It is unclear whether the minerals had been severed from the surface prior to execution of the oil, gas, and mineral lease. Nevertheless, Trans-State entered into a lease agreement with Buel and Nollie Reynolds on October 1, 1968, for the use of the surface of the 2.676 acre tract at issue in this case. This surface lease stated a ten-year term and authorized Trans-State to construct buildings; install tanks, pumps, engines, pipelines, pits, fuel lines, and gas lines; to dig water wells; produce water; and store equipment. The lease also granted any other rights incidental to these rights. Trans-State constructed surface facilities on the 2.676 acre tract and designated those facilities as Plant No. 6. These facilities consist primarily of tanks, pumps, motors, electrical panels and lines, and pipeline headers and connections which, according to the findings of the trial court, may all be removed without damage to the real property. Plant No. 6 is one of several locations in the Eucutta Field used to gather saltwater piped from wells producing out of the Eutaw Oil Pool in the Fieldwide Unit and then pump that water through pipelines to water injection wells located on other lands in the field.

¶6. The surface lease provided a renewal option for an additional ten-year term and a ninety-day period, following termination, for the lessee to remove its equipment and materials from the site. In 1978 Trans-State, by this time known as Amerada Hess Corporation, exercised the renewal option. The surface lease expired by its terms on October 1, 1988. On or about that date, Buel Reynolds, claiming that Amerada Hess had no further right to use the surface of his property, shut down the facilities at Plant No. 6.

¶7. On October 4, 1988, Hess filed a complaint in the Chancery Court of Wayne County against Buel O. Reynolds, and his wife, Nollie F. Reynolds, seeking an injunction to prohibit the Reynoldses' interference with Hess's operations of the equipment and facilities referred to as Plant No. 6 on the 2.676 acre tract of the Reynoldses' surface lands. An agreed order granting a preliminary injunction was approved by the court

on November 8, 1988, and, subject to Hess's posting of a $10,000 bond, restrained the Reynoldses from interfering with the operation of Plant No. 6. This agreed order reserved all rights and defenses of the parties.

¶8. The case lay dormant until February 28, 1996, when the Reynoldses filed a counter-complaint alleging breach of contract and conversion and seeking an award of actual and punitive damages. On August 15, 1996, Hess posted the $10,000 bond ordered in the 1988 agreed order. Upon the death of Buel Reynolds in 1998, the suit was revived in the name of his estate and surviving heirs, Nollie F. and Larry Reynolds. Subsequent proceedings led to the summary judgment in favor of Denbury and Hess whereby the trial court entered final judgment and a permanent injunction enjoining the Reynoldses from interfering with Plant No. 6 and dismissing their counterclaims. The Reynoldses timely perfected this appeal.

## STANDARD OF REVIEW

¶9. This Court conducts de novo review of a trial court's grant of summary judgment. *Merrimack Mut. Fire Ins. Co. v. McDill*, 674 So. 2d 4, 7 (Miss. 1996); *Short v. Columbus Rubber & Gasket Co., Inc.*, 535 So. 2d 61, 63 (Miss. 1988). Thus, the standard that the trial court initially employed under Rule 56(c) is applied here. 10 Wright, Miller & Kane, *Federal Practice & Procedure* § 2716 (1983 & Supp. 1988). The Court must review all evidentiary matters before it in the record: affidavits, depositions, admissions, interrogatories, etc. The evidence must be viewed in the light most favorable to the nonmoving party, and that party is to be given the benefit of every reasonable doubt. *Smith v. Sanders,* 485 So. 2d 1051, 1054 (Miss. 1986); *Dennis v. Searle,* 457 So. 2d 941, 944 (Miss. 1984). The burden of demonstrating that no genuine issue of fact exists is on the moving party. *Short,* 535 So. 2d at 63-64. However, this burden is one of production and persuasion, not of proof. *Fruchter v. Lynch Oil Co.,* 522 So. 2d 195, 198 (Miss. 1988). A motion for summary judgment lies only when there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. Miss. R. Civ. P. 56(c). This Court does not try issues on a Rule 56 motion, it only determines whether there are issues to be tried. Comment, Miss. R. Civ. P. 56.

## ANALYSIS

**I. WHETHER THE LOWER COURT WAS CORRECT IN GRANTING SUMMARY JUDGMENT TO APPELLEES, RULING THAT THE CONTRACT PREPARED BY THE APPELLEES' PREDECESSOR IN TITLE, IN EXISTENCE BETWEEN THE PARTIES AND RECOGNIZED BY THEM AS VALID FOR TWENTY YEARS NOTWITHSTANDING, WAS BARRED AS A MATTER OF LAW.**

¶10. The Reynoldses assert that Trans-State, with the apparent authority of Humble, contracted in the surface lease of 1968 to alter the mineral lessee's surface rights created by the 1940 mineral lease. While they acknowledge that an implicit right to use the surface as reasonably necessary exists in mineral lease contracts, the Reynoldses argue that such a right can be bargained away. They contend that precisely such a bargaining occurred in the case at bar. Hess and Denbury, on the other hand, point to the undisputed fact that the Reynoldses purchased the surface rights subject to the previously severed rights of the mineral owner and mineral lessee to make reasonable use of the surface in mineral exploration and production. Hess argues that its predecessor, Trans-State, under the Fieldwide Unit Agreements, was denied the authority to modify the rights of Humble and that, as a result, the 1968 surface lease cannot supersede the 1940 mineral lease.

¶11. Long-established law in Mississippi provides that the severed mineral owner or lessee has the right to use the surface of the lands for all reasonable purposes to explore and drill for oil and gas and may use as much of the surface as is reasonably necessary to exercise its rights, but it cannot intentionally or negligently damage or use more of the land surface than is reasonably necessary in its mining operation. *Charles F. Hayes & Assocs., Inc. v. Blue*, 233 So. 2d 127, 128 (Miss. 1970) (collecting authorities). It is undisputed in this case that these rights were granted to Humble in the 1940 lease and that Trans-State (Hess) was later given the same rights while serving as operator of the Eucutta Fieldwide Unit.

¶12. The Reynoldses' assertion that the surface lease supersedes the existing mineral lease has been rejected time and again in other jurisdictions. In *Mingo Oil Producers v. Kamp Cattle Co.*, 776 P.2d 736, 740 (Wyo. 1989), the Wyoming Supreme Court found that the termination of the surface lease between the surface owner and operator does not affect the continued right, under the mineral lease, to use as much of the surface as reasonably necessary for oil and gas production and development. Mingo acquired mineral leases which had previously been executed in 1979. In 1984 the surface owner, Kamp Cattle, denied access to Mingo. The two parties then entered into a "Surface Access Agreement" in 1985. In 1987 Kamp Cattle again denied access to Mingo claiming that the agreement had been breached. The Wyoming Supreme Court held that, notwithstanding the agreement, Mingo had the absolute right as mineral lessee to conduct operations on the surface. The court noted that "[w]ithout any agreement, Mingo Oil already had the right, as a function of its dominant estate, to possession provided by the oil and gas lease." *Id.*

¶13. In *Livingston v. Indian Territory Illuminating Oil Co.*, 91 F.2d 833 (10th Cir. 1937), the plaintiff executed a mineral lease to the defendant in 1923. Three years later the plaintiff executed a surface lease in favor of the defendant for a term of three years with an extension option for successive annual terms. In 1929, after it had drilled numerous wells on the premises and built storage tanks, roads, power and telephone lines, and even residences for its employees, Indian Territory notified Livingston that it did not intend to exercise its option to renew the surface lease. Livingston sued for trespass and damages. Applying Oklahoma law, the Tenth Circuit affirmed the trial court's directed verdict for Livingston. The verdict awarded only nominal damages. The court held that Indian Territory had the right, under the mineral lease, to use the surface after expiration of the surface lease as reasonably necessary for orderly and efficient operations. *Id.* at 834-35.

¶14. In *Ball v. Dillard*, 602 S.W.2d 521 (Tex. 1980), the landowner had executed a surface lease to Ball prior to the execution to Dillard of a mineral lease covering the same property. Ultimately a conflict arose between these two lessees. The Texas Supreme Court held that the mineral lessee, as owner of the dominant estate, had the right to use as much of the premises as was reasonably necessary to effectuate the purposes of the lease. *Id.* at 523. *See also*, *Dunn v. Southwest Ardmore Tulip Creek Sand Unit*, 548 P.2d 685 (Okla. Ct. App. 1976) (holding that mineral lessee had right, independent of an existing waste water lease, to use well for reasonable development of recovery unit for recovery of oil and gas); *Property Owners of Leisure Land, Inc. v. Woolf & Magee, Inc.*, 786 S.W.2d 757 (Tex. App. 1990) (holding that mineral owner could not be limited by subdivision restrictions imposed by surface owners after mineral estate was severed).

¶15. In opposition to this line of authority, the Reynoldses rely heavily on two Kansas appellate court cases which, the Reynoldses argue, stand for the proposition that a mineral lessee may extinguish his rights, under

the mineral lease, to use the surface by subsequently entering into a surface lease. In the first case, ***Monfort v. Layton***, 571 P.2d 80 (Kan. Ct. App. 1977), at issue was a letter, written after the mineral lease was executed, in which the lessees agreed to pay for saltwater damage to the lessors' crops caused by the lessees' oil-drilling operations. The letter set forth the agreed method for determining the crop loss each year. The ***Monfort*** court held that the "letter was part and parcel of the original lease, that it could not be construed as an interminable agreement binding the [lessees] in perpetuity, and that when the lease expired so did the lessees' obligation to pay annual crop damage." ***Id.*** at 86. ***Monfort*** did not involve co-existing surface and mineral leases; nor did it mention the superseding of a contract. It is, thus, inapplicable to the case at bar.

¶16. The Reynoldses also offer ***Colburn v. Parker & Parsley Dev. Co.***, 842 P.2d 321 (Kan. Ct. App. 1992), in furtherance of their theory regarding contract superseding and the bargaining away of implied surface rights. There the court considered whether a mineral lessee's execution of a saltwater disposal agreement with the surface owner voided its right, under the mineral lease, for free disposal of on-premises water. The lessee wanted to dispose of off-premises saltwater in addition to the on-premises water. Thus, a saltwater disposal agreement was prepared and executed, but it did not distinguish between saltwater produced on the premises and that produced off the premises. The court explained that, while the right to dispose of on-premises saltwater is normally implied under the mineral lease, no such implied right exists for disposal of off-premises saltwater. The court found that the lessee waived his right for free disposal of on-premises saltwater in favor of expanded rights and the opportunity for economic advantage by receipt of substantial payments for disposal of off-premises water on the lessors' property. ***Id.*** at 328-29.

¶17. Although ***Colburn*** is somewhat closer to the mark than ***Monfort***, it, too, is of limited applicability. First, it does not involve concurrent surface and mineral leases and does not address whether one may entirely supersede the other. Second, ***Colburn*** is factually distinguishable from the case at bar because in ***Colburn*** the mineral lessor and lessee were the same parties who executed the saltwater disposal agreement. A different situation exists in the present case in which Trans-State (Hess) and the Reynolds executed the 1968 surface lease, but neither was a party to the original 1940 mineral lease.

¶18. We find that the Reynoldses' surface lease did not supersede the 1940 mineral lease and that summary judgment was properly granted.

### II. WHETHER OR NOT THE LOWER COURT ERRONEOUSLY CONCLUDED, BY GRANTING APPELLEES' SUMMARY JUDGMENT MOTIONS, THAT THERE WAS NO FORFEITURE OF THE EQUIPMENT INVOLVED IN THE CONTRACT.

¶19. The Reynoldses assert that Hess was required to remove its equipment from the Plant No. 6 site within ninety days of the expiration of the surface lease in October, 1988. According to the Reynolds, because Hess did not accomplish this alleged requirement, the equipment was forfeited and wrongfully converted to use by Hess and, subsequently, Denbury. Obviously, our holding that the Humble mineral lease remained in full force and effect, notwithstanding the execution and subsequent expiration of the surface lease, renders this argument without merit; thus, we shall reject it.

### III. WHETHER THE LOWER COURT ERRED IN DISMISSAL OF APPELLANTS' BREACH OF CONTRACT SUIT FOR ACTUAL AND PUNITIVE DAMAGES WHEN IT CONCLUDED THERE WERE NO GENUINE ISSUES OF MATERIAL FACT ON DAMAGES TO BE DETERMINED BECAUSE THE CONTRACT WAS BARRED AS A

**MATTER OF LAW.**

¶20. Since we find that Hess and Denbury are not in breach, this issue is without merit.

**IV. WHETHER THE TRIAL COURT WAS CORRECT WHEN IT IGNORED APPELLEES' FAILURE TO POST BOND UNTIL ALMOST EIGHT YEARS AFTER THE COURT APPROVED AN AGREED ORDER GRANTING PRELIMINARY INJUNCTION ENTERED INTO BETWEEN THE PARTIES, FOLLOWING THE FILING OF THE INITIAL COMPLAINT FOR INJUNCTIVE RELIEF.**

¶21. The Reynoldses contend that the agreed order granting the preliminary injunction of November 8, 1988, was void and of no effect because Hess did not post a $10,000 bond until August 15, 1996. They reason that the failure to make a timely submission of the bond renders the ultimate judgment and permanent injunction defective. Hess and Denbury maintain that Hess's failure to post bond under the agreed order is moot.

¶22. The Reynoldses cite two cases which address the mandatory nature of the bond-posting requirement. In *Invesat Corp. v. Harrison Enterprises, Inc.*, 386 So. 2d 721, 722 (Miss. 1980), this Court determined that a preliminary injunction was void and should be dissolved because the complainants failed to post the bond required by the chancellor's order. In *International Ass'n of Bridge, Structural and Ornamental Ironworkers, AFL-CIO, Local Union 710 v. Howard L. Byrd Bldg. Serv., Inc.*, 284 So. 2d 301 (Miss. 1973), this Court explained that "[a] condition precedent to the issuance of a preliminary injunction is that the party at whose instance the injunction is granted must post bond in a form and amount to be determined by the issuing court." *Id.* at 304 (citations omitted).

¶23. While these cases clearly mandate the posting of a bond for preliminary injunctions, they are distinguishable from the case sub judice. In *Invesat* no permanent injunction was ever issued. The case came to this Court on interlocutory appeal, and the Court reversed the chancellor's order overruling Invesat's motion to dissolve the preliminary injunction. 386 So. 2d at 722. In the present case, Hess eventually posted the bond, albeit almost eight years later. Subsequently, a final order with a permanent injunction was entered by the trial court. We have previously held that failure to post bond for a preliminary injunction is a moot issue given the appropriateness of the later grant of a permanent injunction. *See, e.g.*, *Carl v. Craft*, 258 So. 2d 237, 240 (Miss. 1972); *Yellow Cab Co. of Biloxi, Inc. v. Checker Taxicab Owners' Ass'n*, 233 Miss. 735, 103 So. 2d 350 (1958).

¶24. In the *Ironworkers* case, this Court ruled that the lower court was without jurisdiction and that the injunction was wrongfully issued. 284 So. 2d at 304. The bond in that case was timely posted in accordance with the requirements of the trial court. *Id.* at 302. An issue arose on appeal as to the appropriateness of the amount of the bond, but there was no question as to its being posted. *Id.* While this Court did express the mandatory nature of the bond, the permanent injunction was dissolved on other grounds. *Id.* at 303-04. Thus, *Ironworkers* is inapplicable.

¶25. Finally, the agreed order provided that Hess post a bond "for payment of such costs and damages as may be incurred or suffered by [the Reynoldses] if they are found to be wrongfully restrained or enjoined." The trial court ultimately found that no damages or costs were due from Hess. Since we agree with this finding, this issue is without merit.

## V. WHETHER AS A MATTER OF LAW THE GRANT OF INJUNCTIVE RELIEF BY THE TRIAL COURT WAS ERRONEOUS BASED ON SUSTAINING APPELLEES' MOTION FOR SUMMARY JUDGMENT.

¶26. The Reynoldses fail to expand on this point of error other than to simply assert once again that genuine issues of material fact do exist. They cite no authorities. This Court has frequently held that an argument unsupported by cited authority need not be considered by the Court. *See, e.g.*, *Hankins v. Hankins*, 729 So. 2d 1283, 1286 (Miss. 1999); *Drennan v. State*, 695 So. 2d 581, 585-86 (Miss. 1997); *Grey v. Grey*, 638 So. 2d 488, 491 (Miss. 1994). However, we have already determined that there was no genuine issue as to any material fact and that summary judgment was properly granted. We further find that the chancellor's grant of a permanent injunction was supported by the evidence.

¶27. The Reynoldses allege that genuine issues of material fact are raised by their own assertions and by the affidavits of their experts. However, they identify no specific material facts as being in dispute but instead address only the legal significance of the undisputed facts. "Mere allegations which do not reveal detailed and precise facts will not prevent the award of summary judgment." *Ellis v. Powe*, 645 So. 2d 947, 952 (Miss. 1994) (quoting *Brown v. Credit Ctr., Inc.*, 444 So. 2d 358, 362 (Miss. 1983)). A deposition or affidavit relied upon in an attempt to show that summary judgment was wrongfully granted must do more than make general assertions and legal conclusions which do not give rise to a genuine issue of material fact. *Liberty Leasing Co. v. Hillsum Sales Corp.*, 380 F.2d 1013, 1015 (5th Cir. 1967). Such are the types of allegations, assertions, and conclusions which have been presented by the Reynoldses. Therefore, this Court finds that the motions for summary judgment were properly granted.

¶28. Further, we find that the permanent injunction was supported by the evidence. To obtain a permanent injunction, a party must show an imminent threat of irreparable harm for which there is no adequate remedy at law. *City of Water Valley v. Trusty*, 343 So. 2d 471, 472 (Miss. 1977). In the present case it is undisputed that on or about October 1, 1988, the date of expiration of the surface lease, Buel Reynolds, claiming that Hess no longer had the authority to utilize the equipment or the surface of his lands, shut down the pumps at Plant No. 6. In granting the preliminary and permanent injunctions, the trial court was apparently satisfied with Hess's showing of the magnitude of the potential irreparable harm that would have occurred as a result of Reynolds's actions. According to Hess, if the water injection plant is peremptorily shut down, the Reynoldses' property as well as other nearby property could be irreparably harmed from saltwater spills. Also, a disruption in the operation of the saltwater injection plant would require Hess to shut down all producing wells affected by the plant, resulting in damage to the entire project and to the oil reservoir. This Court has previously recognized that an oil and gas lessee is entitled to injunctive relief when a surface owner interferes with its operations. *See, e.g.*, *Lewis v. Ada Oil Co.*, 279 So. 2d 622, 625 (Miss. 1973); *Pace v. State ex rel. Rice*, 191 Miss. 780, 4 So. 2d 270, 279 (1941). Hess met its burden in showing the immediacy of the threat of irreparable harm. Furthermore, Hess and Denbury would have no adequate remedy at law to prevent Reynolds and his successors from continuing this harmful action. Therefore, the permanent injunction was properly granted.

## CONCLUSION

¶29. The Reynoldses have presented no compelling legal authority to support their claims that the 1968 surface lease superseded the 1940 Humble mineral lease. Furthermore, the Reynoldses have failed to show any genuine issues of material fact in dispute in this case. Therefore, we affirm the trial court's final judgment

and permanent injunction.

¶30. **AFFIRMED.**

**PRATHER, C.J., PITTMAN AND BANKS, P.JJ., SMITH, COBB AND DIAZ, JJ., CONCUR. McRAE, J., CONCURS IN RESULT ONLY. WALLER, J., NOT PARTICIPATING.**