872 So.2d 79 (2004)
Joseph RAIOLA, Appellant
v.
CHEVRON U.S.A., INC. d/b/a Chevron Pascagoula Refinery; Bill Porter, Individually; and Bobby Burkes, Individually, Appellees.
No. 2002-CA-01171-COA.
Court of Appeals of Mississippi.
February 24, 2004.
Rehearing Denied May 4, 2004.
*81 Kaye J. Persons, attorneys for appellant.
Patrick R. Buchanan, Biloxi, Kimberly Gee Stith, Steven R. McCown, Stacey S. Calvert, attorneys for appellees.
Before KING, P.J., THOMAS and MYERS, JJ.
MYERS, J., for the Court.
¶ 1. Chevron fired Joseph Raiola and he sued alleging discrimination based on national origin, defamation, intentional infliction of emotional distress, breach of contract, tortious interference with contract, and negligent hiring and retention. Chevron removed the suit to federal court. The United States District Court for the Southern District of Mississippi granted Chevron's motion for summary judgment on the federal claims and remanded the state law claims to the Circuit Court of Jackson County. The Circuit Court of Jackson County granted Chevron's motion for summary judgment. As a result, Raiola filed a timely notice of appeal and now requests our review of the following issue:
WHETHER THE TRIAL COURT ERRED IN GRANTING SUMMARY JUDGMENT AS TO RAIOLA'S STATE LAW CLAIMS

STATEMENT OF FACTS
¶ 2. This is an employment dispute involving the alleged wrongful termination of Joseph Raiola. Raiola's employment with Chevron began in 1978, when he was hired at its Perth Amboy, New Jersey refinery. In 1983, Raiola began working at the Pascagoula, Mississippi refinery. Raiola completed the refinery's mandatory three-year training program and was fully qualified as an operator. In 1992, Chevron promoted Raiola to head operator in the utilities section of the operations department.
¶ 3. In 1995, Chevron transferred Raiola to work on the crew under the supervision of shift supervisor Buddy Abney. During this time, Abney documented several deficiencies in Raiola's work performance. After sixteen months under Abney's supervision, Chevron asked if Bobby Burkes *82 would accept Raiola on his crew. Burkes agreed and Raiola began working under Burkes's supervision. Raiola was also placed in Chevron's performance improvement plan. According to the terms of the plan, if Raiola's performance did not improve, he faced termination. In 1996, Burkes removed Raiola from the performance improvement plan and allowed him to work on several special projects.
¶ 4. In 1997, Burkes placed Raiola on a special project to coordinate the shutdown of the boiler. While completing this assignment, Raiola worked independently and without much direct supervision from Burkes. Raiola was informed that he could work as much time as needed to complete the project. Chevron instructed Raiola to report the amount of time actually worked to the particular shift supervisor on duty or directly to Burkes.
¶ 5. Later that year, several of the shift supervisors in the utilities section began to notice that Raiola was frequently unavailable during the late afternoons. Head operators in the unit began to complain that Raiola was not working a complete shift and was not around to complete his duties. As a result, Ed Hurt, a utilities supervisor, asked Danny Kilgore, a shift supervisor, to run a report of the activity of Raiola's card key to determine the hours Raiola was actually in the refinery. Each employee was assigned a card key for security purposes and the system recorded the time that employees entered and exited the refinery.
¶ 6. Hurt gave Burkes a copy of the card access report. Burkes compared the report to Raiola's time sheets and noticed several discrepancies. On several occasions, the report showed that Raiola was at the refinery for significantly less time than his time sheets had indicated. Burkes informed his supervisor, Doug Pottenger, of these discrepancies. Pottenger then informed Bill Porter, the operations manager, that an investigation had begun of Raiola's time.
¶ 7. On November 21, 1997, Johnette Watson, the human resources representative of the operations department, and Burkes met with Raiola to discuss the results of the investigation. At this meeting, Raiola stated that he was not responsible for his time and never looked at his pay stubs.
¶ 8. Raiola next met with Burkes and Porter. Porter decided to suspend Raiola until he could complete the investigation and decide what action, if any, to take. That same day, Porter, Burkes, and Watson held a conference call with the other shift supervisors. Raiola's supervisors reported that they had questioned Raiola about his time, that they could not find Raiola on several occasions, and that Raiola never told them to adjust the projected shifts to reflect the time he actually worked. Porter and Watson presented the investigation results to the refinery's management committee, and Porter recommended that Raiola be terminated for misrepresenting his time, receiving pay for time not worked, and remaining silent about it.
¶ 9. The management committee accepted Porter's recommendation and on November 25, 1997, Porter informed Raiola of his termination. The next day, Raiola called Watson and requested that Chevron initiate a problem resolution process (PRP), alleging his termination was improper and discriminatory. The PRP is an internal process that allows Chevron employees to have a panel of employees review a managerial decision, including termination decisions. Pursuant to the PRP, Raiola and Porter met with an assigned mediator. Porter refused to change his position, and as a result, Raiola took his grievance to a final panel comprised of *83 management and his peers. During the panel meeting, Raiola presented his case. In addition, the panel interviewed Burkes, Porter, and other employees regarding Raiola's allegations that his termination was discriminatory and unjust. After this process was completed, the PRP panel concluded that Raiola's claim of discrimination was not credible. As a result, the PRP panel affirmed the company's termination decision.
¶ 10. On December 14, 1997, Raiola filed a claim for unemployment compensation with the Mississippi Employment Security Commission (MESC). The MESC determined that Raiola was terminated for misconduct and denied him unemployment benefits. Raiola appealed this decision, and after testimony from Raiola, Burkes, and Porter, the MESC referee affirmed the decision to deny benefits. That determination was then appealed to the MESC Board of Review which affirmed the previous findings. Raiola filed an appeal with the Circuit Court of Jackson County but later requested and was granted a voluntary dismissal prior to a determination.
¶ 11. On February 9, 1998, Raiola filed a complaint with the Equal Employment Opportunity Commission (EEOC). The EEOC found probable cause existed that Chevron had violated Title VII and issued Raiola a right to sue letter. Raiola then brought suit under 42 U.S.C. Section 1981 in the Circuit Court of Jackson County, alleging that his termination from Chevron was based on national origin discrimination and, therefore, was unlawful. In addition, Raiola brought claims for defamation, intentional infliction of emotional distress, breach of contract, tortious interference with contract, and negligent hiring and retention. Chevron removed the case to the United States District Court for the Southern District of Mississippi.
¶ 12. On January 5, 2000, the district court granted Chevron's motion for summary judgment as to Raiola's federal claims and remanded the state claims to the Circuit Court of Jackson County. On June 14, 2002, the Circuit Court of Jackson County granted Chevron's motion for summary judgment as to the remaining state claims. Aggrieved by this result, Raiola filed a notice of appeal requesting a reversal in his favor. Finding no error, however, we affirm the decision of the Circuit Court of Jackson County.

LEGAL ANALYSIS

I. WHETHER THE TRIAL COURT ERRED IN GRANTING SUMMARY JUDGMENT AS TO RAIOLA'S STATE LAW CLAIMS
¶ 13. We review a summary judgment de novo. Johnson v. Baptist Mem'l Hosp.-Golden Triangle, Inc., 843 So.2d 102, 104 (¶ 10) (Miss.Ct.App.2003). Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." M.R.C.P. 56(c). The evidence must be viewed in the light most favorable to the nonmoving party, and that party is to be given the benefit of every reasonable doubt. Smith v. Sanders, 485 So.2d 1051, 1054 (Miss.1986). However, a mere allegation by the nonmovant that a dispute over material facts exists between the parties will not defeat a movant's otherwise properly supported motion for summary judgment. Reynolds v. Amerada Hess Corp., 778 So.2d 759, 765(¶ 9) (Miss. 2000). In addition, a dispute about a material fact is genuine only if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. Id.
*84 ¶ 14. On appeal, Raiola argues that he is not collaterally estopped from raising his state law claims and that Chevron failed to meet its burden of proof as to summary judgment. Chevron argues that Raiola is precluded from raising his state law claims because the MESC has already adjudicated his claim and has repeatedly found that Chevron terminated Raiola for cause. Chevron further argues the evidence establishes, as a matter of law, that Chevron, Burkes, and Porter have not committed any violations of tort or contract law in terminating Raiola.

1. The Preclusive Effect of the MESC Ruling
¶ 15. Raiola argues he is not precluded from raising his state law claims for several reasons. First, the district court judge remanded Raiola's state claims instead of exercising supplemental jurisdiction. Second, he was not allowed to properly raise his state law claims at the MESC hearing. Finally, his state law claims were not determined and not essential to the referee's determination. Chevron argues that issues conclusively decided by the MESC's Board of Review at an administrative proceeding may not be challenged in a later lawsuit involving the propriety of the termination. In other words, since Raiola chose not to appeal the MESC finding, he is now precluded from relitigating the issue.
¶ 16. We begin our analysis by stating that there is no evidence in the record that the district court judge made any findings as to the merits of Raiola's state claims. More importantly, Raiola cites no authority for the proposition that a remand order constitutes a favorable disposition of state law claims. As to Raiola's second and third contentions, we also find no merit. Raiola contends that he was denied a fair opportunity to litigate his state claims because he was prohibited from calling witnesses. However, this issue should have been raised through a direct appeal of the MESC's Board of Review decision. Miss. Code Ann. § 71-5-531 (Rev.2000). As noted above, Raiola initially appealed the Board of Review's decision to the Circuit Court of Jackson County but later requested and was granted a voluntary dismissal. In addition, the Board of Review's finding of fact that Raiola was fired for misconduct is conclusive upon this Court if it is supported by evidence and in the absence of fraud. Miss.Code Ann. § 71-5-531 (Rev.2000). The MESC heard testimony from Raiola, Burkes, and Porter. In addition, there are no allegations of fraud. As a result, Raiola is precluded from arguing before this Court that Chevron's termination decision was illegal. See Hood v. Dept. of Wildlife Conservation, 571 So.2d 263 (Miss.1990); Miss. Employment Sec. Comm'n v. Phila. Mun. Separate Sch. Dist. of Neshoba Co., 437 So.2d 388 (Miss. 1983).
¶ 17. The question remains, however, whether all of Raiola's state law claims are precluded. In other words, whether the propriety of Raiola's termination was essential to all of his tort and contract claims. We decline to apply Hood to that extent. Nevertheless, we affirm the trial court's grant of summary judgment because we find Raiola unable to meet all of the necessary elements of his remaining claims.

2. Raiola's State Law Claims
¶ 18. In order for Raiola to prevail on a claim of defamation, he must prove that the employees made (1) a false and defamatory statement, (2) unprivileged publication to a third party, (3) negligence on the part of the employees in publishing the statement, and (4) there is either actionability of the statement irrespective of *85 special harm or existence of special harm caused by publication. Eselin-Bullock & Assoc. Ins. Agency, Inc. v. Nat'l Gen. Ins. Co., 604 So.2d 236, 241 (Miss.1992); Blake v. Gannett Co., Inc., 529 So.2d 595, 602 (Miss.1988).
¶ 19. Raiola argues he was defamed because three employees labeled him a thief. Raiola alleges that Porter called him a thief during the PRP. The second statement is alleged to have been made by Watson during the MESC hearing. Raiola finally alleges that Burkes called him a thief but there is no evidence in the record of such a statement.
¶ 20. It should be noted that truth is an absolute defense to a defamation claim. Fulton v. Miss. Publishers Corp., 498 So.2d 1215, 1217 (Miss.1986). Since it has already been determined that Raiola was guilty of receiving pay for time not worked, Porter and Watson's claim that Raiola was a thief would be protected. Moreover, Porter enjoyed a qualified privilege because any statement made by an employer against an employee when the statement in question affects the employee's employment is protected by a qualified privilege. Young v. Jackson, 572 So.2d 378, 383 (Miss.1990). These statements are privileged "absent bad faith or malice if the communications are limited to those persons who have a legitimate and direct interest in the subject matter." Id.
¶ 21. Raiola has presented no evidence that Porter's statements were made with actual malice. Moreover, Raiola admitted in his deposition that Porter never acted in any way that would indicate bad faith or malice toward him. In addition, a company's employees have a legitimate and direct interest regarding the reasons for a co-worker's dismissal. Garziano v. E.I. DuPont De Nemours & Co., 818 F.2d 380, 387 (5th Cir.1987) (citing Benson v. Hall, 339 So.2d 570, 573 (Miss.1976)).
¶ 22. As for Watson's statement, she enjoys an absolute privilege because it was made during the course of the MESC hearing. See Miss.Code Ann. § 71-5-131 (Rev.2000). As a result, we find Raiola's defamation claim to be without merit.
¶ 23. In order for Raiola to prevail on a claim of intentional infliction of emotional distress, he must prove Chevron's conduct to be so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Brown v. Inter-City Fed. Bank, 738 So.2d 262, 264(¶ 9) (Miss.Ct.App.1999). Under our law, liability does not extend to mere insults, indignities, threats, annoyances, petty oppression, or other trivialities. Id. Furthermore, damages for intentional infliction of emotional distress are usually not recoverable in mere employment disputes. Id. "Only in the most unusual cases does the conduct move out of the realm of an ordinary employment dispute into the classification of extreme and outrageous, as required for the tort of intentional infliction of emotional distress." Prunty v. Arkansas Freightways, Inc., 16 F.3d 649, 654 (5th Cir.1994).
¶ 24. Raiola argues that Burkes made inappropriate remarks about his Italian heritage; that he was terminated for reasons he did not think justified Chevron's decision; and that Porter and Watson called him a thief during the PRP meeting and the MESC hearing, respectively. However, we find these acts insufficient to support a claim of this nature. Although Chevron's alleged treatment of Raiola, if true, may have been inappropriate or even upsetting, none of the conduct rises to the level of extreme and outrageous. Raiola admitted that the remarks about his heritage did not bother him as much as his *86 termination. In addition, Raiola did not complain of any mistreatment until after he was terminated. As a result, we find Raiola's claim for intentional infliction of emotional distress to be without merit.
¶ 25. Raiola claims that Chevron is liable for breach of contract, tortious interference with contract, and negligent hiring and retention. However, Raiola has failed to address these claims in his brief. For the sake of argument, we will briefly analyze Raiola's remaining claims.
¶ 26. Raiola argues Chevron breached its contract with him despite the fact that he was an employee at will. Coleman v. Miss. Employment Sec. Comm'n, 662 So.2d 626, 628 (Miss.1995). Raiola presented no evidence of an employment contract. In addition, Chevron's written policy stated that it could terminate employees without cause or notice at any time. Under Mississippi law, contractual liability will not attach where the employer explicitly states that its policies do not form a contract. Hartle v. Packard Elec., 626 So.2d 106, 109 (Miss.1993). This was the case here. As a result, we find Raiola's breach of contract claim to be without merit.
¶ 27. Raiola argues that Burkes and Porter tortiously interfered with his employment contract. Despite having no employment contract, Mississippi allows for such a cause of action absent such a contract. See Levens v. Campbell, 733 So.2d 753, 760 (¶ 27) (Miss.1999). Nevertheless, Raiola's claim fails for other reasons. This is because Burkes and Porter are privileged to interfere with Chevron's contractual relationship with Raiola if they occupy a position of responsibility with the company when they are working within the scope of that responsibility and absent bad faith. Shaw v. Burchfield, 481 So.2d 247, 255 (Miss.1985).
¶ 28. Porter is the operations manager for Chevron and is responsible for the supervision of its employees. This responsibility entails recommending employees for termination. In addition, Raiola has presented no evidence of bad faith regarding Porter's decision. Likewise, Burkes was a shift supervisor at Chevron. Burkes was responsible for investigating violations of head operators under his supervision. Like Porter, Burkes was acting within his authority when he investigated Raiola's time reports. Moreover, Burkes did not recommend Raiola's termination and any alleged comments by Burkes were found to be unrelated to Raiola's termination. As a result, we find Raiola's tortious interference with contract claim to be without merit.
¶ 29. Finally, Raiola argues that Chevron was negligent in the hiring and retention of Burkes and Porter. In order to prevail, Raiola must prove (1) that Chevron knew or should have known of some incompetence on the part of Burkes and Porter and (2) that Chevron failed to do anything about it. Jones v. Toy, 476 So.2d 30, 31 (Miss.1985).
¶ 30. Raiola argues that he suffered from discriminatory comments made by Burkes. However, Raiola admitted that he never made a formal complaint regarding this alleged abuse until after he was terminated. Raiola also admitted that he had no evidence of incompetence on the part of Porter. Raiola has failed to prove all of the essential elements of this cause of action. As a result, we find it to be without merit.
¶ 31. After examining the evidence in the light most favorable to Raiola, this Court finds that Chevron has demonstrated that there is no genuine issue of material fact as to any of Raiola's claims. As a result, we affirm the trial court's grant of summary judgment.
*87 ¶ 32. THE JUDGMENT OF THE CIRCUIT COURT OF JACKSON COUNTY IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.
McMILLIN, C.J., KING AND SOUTHWICK, P.JJ., BRIDGES, THOMAS, LEE, IRVING, CHANDLER AND GRIFFIS, JJ., CONCUR.